| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**SAUL EWING ARNSTEIN & LEHR LLP**<br>One Riverfront Plaza<br>1037 Raymond Blvd., Suite 1520<br>Newark, NJ 07102-5426<br>(973) 286-6714<br>Stephen B. Ravin, Esq.<br>stephen.ravin@saul.com<br><br>Attorney for US Elite LLC, Joseph Bodner & Steven Keefer | |
| In Re:<br><br>ZAYAT STABLES LLC<br>　　　　　　　　　Debtor. | Case No.:  20-20524<br><br>Chapter 7 Case<br><br>Judge:  Vincent F. Papalia |

**PETITIONING CREDITORS' MOTION TO APPOINT INTERIM TRUSTEE**

NOW COMES the petitioning creditors, Joseph Bodner ("Bodner"), Steven Keefer ("Keefer") and US Elite LLC ("US Elite") (collectively, the "Petitioning Creditors"), by and through the undersigned counsel, on their Motion to Appoint an Interim Trustee on behalf of Zayat Stables LLC (the "Alleged Debtor"), pursuant to 11 U.S.C. § 303(g) and Federal Rule of Bankruptcy Procedure 2001 (the "Motion").  In support of the Motion, the Petitioning Creditors state respectfully as follows:

### I.　　Background Facts

1.　　On September 14, 2020, the Petitioning Creditors filed an involuntary Chapter 7 petition against the Alleged Debtor.  The Petitioning Creditors are owed $150,000 (Bodner}, $275,000 (Keefer) and $188,500 (US Elite). Each of the Petitioning Creditors loaned money to the Alleged Debtor, which were evidenced in writing.  The amounts owed to the Petitioning

Creditors are not contingent as to liability or subject to a bona fide dispute. *See,* 11 U.S.C. § 303(b)(1).

2. The Alleged Debtor is in the thoroughbred horse business and has had much success in the racing industry. In an effort to build upon that success, the Alleged Debtor borrowed money from third parties in order to invest in additional thoroughbred horses. It is the Petitioning Creditors understanding that, at one point, the Alleged Debtor had an ownership interest in over seventy (70) horses which were of significant value.

3. In 2016, the Alleged Debtor looked to capitalize on the success of **AMERICAN PHAROAH**, winner of the Triple Crown and Breeders Cup Classic, and looked to further capitalize on its success and grow its business. It was courted by respected names in the investment banking and private equity industry. The Alleged Debtor explored a potential, monumental equity deal to continue its trajectory of growth which would provide long-term liquidity for expanding the business; however, due to the timing of the negotiations, the Alleged Debtor needed an interim, quick shorter-term financing option as it continued to explore a longer-term equity solution.

4. At that time, MGG Investment Group LP ("MGG") was introduced to the Alleged Debtor as a potential financing source. In or around the summer of 2016, the Alleged Debtor commenced negotiations with MGG regarding a short-term loan, which, on information and belief, was memorialized in writing by the Alleged Debtor and MGG. The Petitioning Creditors have never been privy to reviewing the loan documents between the Alleged Debtor and MGG. Upon information and belief, in 2018, MGG asserted that a default existed under its loan documents, and, as a result, the Alleged Debtor borrowed money from several alternative sources including the Petitioning Creditors.

37478195.1

5. By the Fall of 2019, the Alleged Debtor faced significant liquidity issues and failed to make a required payment to MGG. The Alleged Debtor also failed to repay the loans of the Petitioning Creditors.

6. On January 22, 2020, at the request of MGG, the Circuit Court for the Commonwealth of Kentucky (the "State Court") appointed Elizabeth Z. Woodward, as receiver ("Receiver"), to administer the assets of the Alleged Debtor and maximize their value (the "Receiver Order"). A copy of the Receiver Order is attached hereto as Exhibit A and made a part hereof.

7. In order to assist the Receiver in getting her arms around the Alleged Debtor's assets, she retained Gatewood Bell, a consultant familiar with the equine industry. Together, they created a list of collateral, which presumably secured the loan made by MGG to the Alleged Debtor.

8. The Receiver has not been charged with determining the validity, priority, or payment of existing and conflicting liens as set forth in Paragraph E of the Order Modifying the Receiver Order dated March 9, 2020 ("Receiver Modification Order"). A copy of the Receiver Modification Order is attached hereto as Exhibit B and made a part hereof.

9. On June 25, 2020, the State Court entered an Order granting summary judgment against the Alleged Debtor and in favor of MGG ("Judgment") in the amount of $24,534,166.13 ("MSJ Order"). A copy of the MSJ Order is attached hereto as Exhibit C and by express reference made a part hereof.

10. The MSJ Order further states that MGG shall not take any further action to collect or enforce the Judgment as it is neither final nor appealable. The MSJ Order also preserves certain counterclaims filed by the Alleged Debtor against MGG.

37478195.1

### III. Relief Requested

11.     Under Section 303(g) of the Bankruptcy Code, the Petitioning Creditors are seeking the appointment of an Interim Trustee in order to preserve property of the estate after the commencement of the involuntary case under Chapter 7 of the Bankruptcy Code.  11 U.S.C. § 303(g).

12.     During the gap period between the date the involuntary petition was filed and a hearing on whether an order for relief should be entered, the Petitioning Creditors contend that an Interim Trustee needs to be appointed in order to prevent the Receiver from disposing, dissipating or distributing assets prior to the entry of an order for relief.

### III. Basis for the Relief Requested

13.     The Petitioning Creditors believe that, over the past nine months, since the appointment of the Receiver, there are legitimate questions about the following: (i) reduced prices for quick sales of the Alleged Debtor's horses; (ii) whether the Receiver sold horses by private sale to parties who may be insiders of the Alleged Debtor's Consultant, Gatewood Bell, which may explain the reason that the horses were sold at significantly deflated prices and (iii) whether the Receiver has failed to purchase and/or maintain insurance for certain horses which could have, upon their death, brought additional and well-needed funds into the estate to pay all creditors.

14.     The Receiver, shortly after being appointed, entered horses in the Fasig-Tipton Winter Mixed Sale in February 2020. As described in detail in the Alleged Debtor's Counterclaim pending in State Court, one of the horses entered was the broodmare named **MEGALICIOUS**, who was in foal to the prominent stallion **PAYNTER**.  Upon information and

belief, no reserve or minimum price was placed on **MEGALICIOUS**. Instead, she was sold quickly by the Receiver at an auction sale in order to generate necessary funds for the Receivership. As a result, **MEGALICIOUS** sold for only $6,000, which appears to the Petitioning Creditors to be far less than her actual value.

15. Just a month later, during very uncertain times in the financial and equine industry, a daughter of **MEGALICIOUS** sold for $650,000 as the top selling two-year old at the Ocala Breeders' March Sale. As stated above, the Receiver sold **MEGALICIOUS** and her unborn foal for a total of $6,000 when just one of her foals sold for one hundred (100) times that amount a few weeks later.

16. Moreover, in 2019, an offspring of **PAYNTER** sold for $500. The Petitioning Creditors are confident that, as the half sibling to the multiple stakes winner of **BOB AND JACKIE, 2019 PAYNTER/FATEER**, as a leading 4th crop stallion, was worth, at a minimum, $20,000. The Receiver, however, sold the horse for what the Petitioning Creditors believe to be pennies on the dollar.

17. **SALOW** is a horse originally purchased by the Alleged Debtor in September 2019 for $390,000 and won its debut first race at Gulfstream Park on July 3, 2020. The Receiver sold **SALOW** ten days later on July 13, 2020, for $175,000, which was less than fifty percent (50%) of its purchase price. After the sale, **SALOW** came back to win an allowance race at Lone Star (giving the buyers now even more of a deal) along with the horse being groomed for a $750,000 stake race. On information and belief, **SALOW** is still an undefeated three-year old, and the Petitioning Creditors believe could be pointing to the Preakness on October 13, 2020. The Petitioning Creditors question whether **SALOW** was sold at a rock-bottom price by the Receiver, especially given the success that **SALOW** has received to date.

5

18. Another example of the Receiver not looking out for the benefit of all the creditors is when the Receiver chose not to insure **FINALLY THE ONES**, even though it was the most expensive horse in the entire crop. The Alleged Debtor owned 75% of **FINALLY THE ONES,** which the Petitioning Creditors believe was purchased for $800,000. Unfortunately, **FINALLY THE ONES** died, and the Receiver did not receive any insurance proceeds resulting from his unexpected death.

19. Furthermore, certain of the Receiver's sales have been to Cheyenne Stables, which, on information and belief, is owned by Everett Dobson and managed by Gatewood Bell, the Receiver's consultant. Often times, Gatewood Bell purchases horses on behalf of Cheyenne Stables; however, in the case of one of the private sales, the purchase of the horse from the Receiver was under the name "Cromwell Bloodstock," which is Gatewood Bell's agency. *See*, https://www.bloodhorse.com/horse-racing/articles/218248/the-next-generation-gatewood-bell. Any private sale to an "insider" prohibits the Receiver from obtaining the highest and best sales price for the benefit of all creditors, which is another reason that the Petitioning Creditor are requesting the immediate appointment of an Interim Trustee in the Chapter 7 Case.

20. As of August 31, 2020, the Receiver has collected approximately $1,388,096 from purse proceeds and sales of horses. On the flipside, the Receiver expended approximately $835,772 on operations such as board bills, veterinary bills, administrative fees and commissions necessary in connection with the sales to date. These amounts are referenced in the Receiver's Seventh Monthly Report ("Receiver's 7th Report"), a copy of which is attached hereto as Exhibit D and by express reference made a part hereof. As set forth in the Receiver's 7th Report, these amounts do not include Receivership expenses paid directly by MGG (i.e., mortality insurance and professional fees). Based upon the number of sales within the past eight (8) months, the net

income the Receiver has generated as compared to the Judgment and unsecured debt is nominal at best.

21. These are just a few examples of how the Receiver's actions have impaired the value of the Alleged Debtor's collateral to the detriment of the Petitioning Creditors. Based upon the foregoing, the Petitioning Creditors are requesting that an Interim Trustee be appointed immediately in order to preserve the highest and best value of the Alleged Debtor's remaining collateral for the benefit of all creditors (not just MGG) and before any money is paid out by the Receiver in connection with the Judgment.

## IV.   Conclusion

25. In light of the foregoing, it is imperative that the Interim Trustee be appointed immediately in order to protect the interest of all creditors, not just MGG who initiated the request for the appointment of the Receiver in Kentucky.  Moreover, the Interim Trustee is an independent third-party fiduciary who will be tasked with duties of a trustee under 11 U.S.C. §704 including accounting for all property of the estate and ensuring that all alleged liens are valid.  Since the Petitioning Creditors do not know the Receiver's plans for any upcoming sales, it is urgent that the Interim Trustee take over the administration of the Alleged Debtor's estate immediately in order to prevent any additional sales without further investigation and evaluation of the circumstances surrounding each horse as well as the other collateral that is property of the Alleged Debtor's estate.  Here, the perception of value of the Alleged Debtor's assets has varied widely between the Receiver and the Petitioning Creditors; therefore, the immediate appointment of an Interim Trustee is critical.

WHEREFORE, Petitioning Creditors, Joseph Bodner, Steven Keefer and US Elite LLC, respectfully request this Court enter an order appointing an Interim Trustee to preserve the Alleged Debtor's assets during the gap period and grant any further relief this Court deems just and proper under the circumstances.

| | |
|---|---|
| Dated: Newark, New Jersey<br>September 17, 2020 | **SAUL EWING ARNSTEIN & LEHR LLP**<br><br>By:  /s/ Stephen B. Ravin<br>Stephen B. Ravin<br>One Riverfront Plaza, Suite 1520<br>1037 Raymond Boulevard<br>Newark, New Jersey 07102<br>Tel:  (973) 286-6714<br>*Attorneys for Joseph Bodner, Steven Keefer & US Elite* |