UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in compliance with D.N.J. LBR 9004-2(c)

OKIN HOLLANDER LLC
Glenpointe Centre West, 2nd Floor
500 Frank W. Burr Blvd., Suite 40
Teaneck, NJ 07666
T: 201-947-7500
F: 201-947-2663
Paul S. Hollander, Esq.
phollander@okinhollander.com
Margreta M. Morgulas, Esq.
mmorgulas@okinhollander.com

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
T: 212-756-2000
F: 212-593-5955
Adam C. Harris, Esq.
Adam.Harris@srz.com
*Pro Hac Vice Application Pending*

Co-Counsel for MGG Investment Group LP

| | |
|---|---|
| In re:<br><br>ZAYAT STABLES, LLC,<br><br>                Alleged Debtor. | Case No. 20-20524 (VFP)<br><br>*Involuntary* Chapter 7<br>Judge: Hon. Vincent F. Papalia |

**MOTION OF MGG INVESTMENT GROUP LP FOR ENTRY OF AN ORDER: (A) EXCUSING DULY APPOINTED STATE COURT RECEIVER FOR THE ALLEGED DEBTOR FROM COMPLIANCE WITH THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 543(b); (B) DURING THE "GAP PERIOD," ALLOWING THE RECEIVER TO CONTINUE TO USE CASH COLLATERAL AND PERMITTING MGG TO CONTINUE TO MAKE DISCRETIONARY ADVANCES, EACH IN A MANNER CONSISTENT WITH ITS RIGHTS AS A SECURED CREDITOR UNDER THE LOAN DOCUMENTS; (C) GRANTING THE PARTIES RELIEF FROM THE AUTOMATIC STAY PROVISIONS CONTAINED IN BANKRUPTCY CODE SECTION 362 AS AND TO THE EXTENT NECESSARY TO ALLOW FOR THE IMPLEMENTATION OF THE RELIEF REQUESTED HEREIN; AND (D) DENYING, OR IN THE ALTERNATIVE, MODIFYING THE RELIEF REQUESTED IN PETITIONING CREDITORS' MOTION TO APPOINT INTERIM TRUSTEE [DKT. NO. 7]**

MGG Investment Group LP ("**MGG**"), the prepetition senior secured lender to the alleged above-captioned debtor Zayat Stables, LLC ("**Zayat Stables**" or the "**Alleged Debtor**"), hereby submits this motion (the "**Motion**") seeking the entry of an order, substantially in the form annexed hereto (the "**Proposed Order**"): (a) excusing Elizabeth Woodward, the Receiver for Zayat Stables appointed by the Commonwealth of Kentucky, Fayette Circuit Court (the "**Receiver**") from compliance with the requirements of Bankruptcy Code Section 543(b); (b) during the "Gap Period" (as defined herein below), allowing the Receiver (i) to continue to use MGG's cash collateral and (ii) permitting MGG to continue to make, and the Receiver to accept, discretionary protective advances from MGG (in each case consistent with and to be governed by MGG's rights as a secured creditor under the Loan Documents, as defined herein below), each as may be necessary to fund the ordinary course operations of the receivership and to preserve the Collateral until the Receiver completes the liquidation thereof; (c) granting limited relief from the automatic stay provisions of the Bankruptcy Code as and to the extent necessary to implement the relief sought hereby; and (d) denying, or in the alternative, modifying the relief requested by the Petitioning Creditors (as defined herein below) in their motion seeking the appointment of an interim trustee (the "**Interim Trustee Motion**").[1]

---

[1] On September 24, 2020, Ahmed Zayat ("Zayat") purportedly acting through Kentucky counsel and his New Jersey Chapter 7 counsel, filed in the United States District Court for the Eastern District of Kentucky, Central Division at Lexington, a Removal Petition (the "Removal Petition") with respect to MGG's receivership action pending before the Kentucky Court (as hereinafter defined). A copy of the Removal Petition is attached to this Motion as Exhibit A. Paragraph 17 of the Removal Petition states that it is appropriate for the "Removed Action" to be transferred to the United States District Court for the District of New Jersey and that upon such transfer, the Removed Action should be referred to this Court.

The filing of the Removal Petition raises a number of concerns that bear upon this Motion and the Interim Trustee Motion that, as a result of a lengthy Scheduling Conference with the Court on September 18, 2020, are scheduled to be heard in a single hearing on October 6, 2020 at 2:30 p.m. Although Chapter 7 counsel for Zayat participated in the Scheduling Conference (as did

In support of the Motion, MGG submits herewith the Declaration of Dane A. Joella, a Director at MGG, dated September 25, 2020 and the exhibits thereto (the "**September 25 Joella Declaration**"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.    This contested matter arises out of the Petitioning Creditors' eleventh hour desperate attempt to forestall the Receiver appointed in the Kentucky state court litigation (the "**Kentucky Litigation**") from liquidating the remaining Collateral[2] that secures the Alleged Debtor's obligations to MGG under the Loan Documents .  The Kentucky Litigation concerning MGG's efforts to liquidate Zayat Stables' assets (which serve as the Collateral securing the approximately $24,534,166.13 in outstanding loans made by MGG to Zayat Stables) has been contentious and difficult – in large part because the Alleged Debtor's sole member, Zayat, had for years completely mismanaged Zayat Stables and treated it as his and his family's personal piggybank.  By way of example, Zayat surreptitiously sold significant portions of the Collateral and redirected the proceeds thereof to other purposes in direct contravention of the Loan Documents, which required that MGG receive specified amounts upon the sale of such assets. *See* Complaint (Exhibit 1 to September 25 Joella Declaration) at Exhibit Q and September 25 Joella Declaration at Exhibit 8.  Zayat also allowed the Alleged Debtor to provide more than $1

---

Kentucky Court counsel for Zayat), neither counsel made any mention of the possibility that a removal petition would be filed by Zayat. Had counsel disclosed their intentions to this Court, the schedule established by the Court could have provided a reasonable time period for the implication of such filing to be addressed in this Motion, which the Court directed to be filed by September 25, 2020.   Further, counsel for Zayat never raised with the Court during the Scheduling Conference the issue of whether the filing of a removal petition involving a case in which Zayat Stables was a principal defendant required relief from the automatic stay in the Zayat Stables Involuntary Chapter 7 Case (as hereinafter defined).  Under the circumstances, MGG reserves its right to address issues raised by the Removal Petition in a separate submission to the Court.

[2] Terms otherwise not defined herein shall have the meaning ascribed to them in the Loan Documents.

million to his son Justin, which was used as a down payment on Justin's New York City apartment. *See* September 25 Joella Declaration at ¶18 and Exhibit 9.

2.    Because of the gross mismanagement of the Alleged Debtor, MGG sought and obtained the appointment of the Receiver in the Kentucky Litigation. The Commonwealth of Kentucky, Fayette Circuit Court (the "**Kentucky Court**") granted the relief requested on January 22, 2020. *See* September 25 Joella Declaration at Exhibit 3. Upon the entry of that order the Receiver took over the day-to-day operations of Zayat Stables and, together with her counsel and equine consultant, began thoughtfully liquidating the Collateral. Not surprisingly, Zayat Stables was displeased with this result and tried on several occasions to have the Receiver either ousted or have her duties significantly limited. The Kentucky Court denied substantially all of Zayat Stables' requests. *See* September 25 Joella Declaration at Exhibit 4.

3.    On September 14, 2020, after the Alleged Debtor had been unsuccessful in making any headway in the Kentucky Litigation with respect to the ouster of the Receiver, three (3) alleged creditors of Zayat Stables (collectively, the "**Petitioning Creditors**")[3] filed an involuntary Chapter 7 case in this Court.[4] In connection therewith, the Petitioning Creditors

---

[3] The Petitioning Creditors are listed as US Elite LLC ("US Elite"), Joseph Bodner ("Bodner") and Steven Keefer ("Keefer").

[4] It is far from certain that the Petitioning Creditors were qualified under Bankruptcy Code Section 303 to file the Involuntary Chapter 7 Case and MGG is presently researching the same. Indeed, an initial review of the Alleged Debtor's books and records contains nothing reflecting any of the loans allegedly made by the Petitioning Creditors to the Alleged Debtor. In response to a request that the Petitioning Creditors provide MGG with evidence relating to the indebtedness owed by the Alleged Debtor to the Petitioning Creditors, counsel for the Petitioning Creditors produced, in the case of Bodner, evidence of a $150,000.00 wire transfer made on November 29, 2018 and text messages to/from "Uncle Joey" Bodner and, in the case of Keefer and US Elite, evidence of a $275,000.00 wire transfer made by Keefer on May 31, 2018 and a $188,500.00 wire transfer made by US Elite on October 29, 2018 along with a memorandum dated November 7, 2018. *See* emails from Stephen Ravin dated September 22, 2020, September 25 Joella Declaration at Exhibit 10. None of these "Obligations" were ever disclosed by Zayat Stables on the monthly financial statements provided to MGG as either "Accounts Payable" or "Long Term Liabilities." Additionally, text messages sent by

filed the Interim Trustee Motion, pursuant to which the Petitioning Creditors seek the appointment of an interim Chapter 7 trustee (an "**Interim Trustee**") to assume management of Zayat Stables' assets and business, and in particular control over the remaining Equine Collateral.

4.     In doing so, the Petitioning Creditors effectively seek the ouster of the Receiver. This, however, makes no sense at this juncture.  The disinterested Receiver, Receiver's counsel and Receiver's equine consultant are all well-versed in the highly specialized field of thoroughbred operations.  They have spent eight (8) months learning about the Alleged Debtor's assets and operations and what is required to liquidate the  Collateral in a manner that is intended to maximize value.  As of the filing of the Receiver's most recent monthly report (for the month ending August 31, 2020) in the Kentucky Litigation, the Receiver has sold, in equine auctions or through private sales, the majority of the forty-five (45) horses owned by Zayat Stables at the time of her appointment.  *See* Exhibit 7 to the September 25 Joella Declaration).  Indeed, only fifteen (15) horses remain to be sold.  .

5.     If an Interim Trustee were to assume control of Zayat Stables at this time, he/she would have to expend significant resources learning about the Alleged Debtor's operations and the Collateral, not to mention equine law.[5]  This is nonsensical because the Receiver is in the

---

Bodner to Mr. Ravin on September 30, 2020 included in Exhibit 10 to the September 25 Joella Declaration demonstrate that the Petitioning Creditors were preparing the involuntary petition for the Involuntary Chapter 7 Case for at least one (1) week before Zayat filed his individual Chapter 7 Case. Accordingly, MGG hereby reserves all rights to seek the dismissal of the involuntary case and any and all sanctions allowable under the Bankruptcy Code at a later date.

[5] Since the Alleged Debtor does not own or operate a physical stable, each of the fifteen (15) horses is boarded at a stable owned by a third party in various locations around the country.  Any Interim Trustee appointed would be required to determine the location of each horse, understand the terms and conditions under which the horse is being boarded, understand the relationship between that stable and the Alleged Debtor (including payment history, training and racing preparation, medical and veterinary issues, etc.).  All of this work has already been done by the Receiver at significant cost.

best position, given her eight (8) months on the job, to complete the liquidation of the Alleged

Debtor's Collateral and to run the remaining day-to-day operations of the Alleged Debtor. An

Interim Trustee would need to re-invent the knowledge base that the Receiver has already

developed, establish relationships with numerous third parties who are providing necessary

services to the Receiver, and retain new professionals and consultants. All of these requirements

would need to be done from a remote base of operations and would be entirely duplicative of

costs that have already been incurred.

6.      Additionally, it is unclear how an Interim Trustee will fund any continued

operation of the Alleged Debtor's business and/or the liquidation of the Alleged Debtor's

remaining Collateral.  Presently, the costs and expenses of the receivership are funded by one of

two sources.   MGG has directly funded, as discretionary protective advances under the Loan

Documents, certain vital monthly costs and expenses associated with the operation of the

receivership (*e.g.*, mortality insurance and professional fees and expenses).[6]  The remainder of

the post-receivership costs and expenses (*e.g.,* board bills, veterinary bills and administrative fees

and commissions that the Receiver is required to pay on  sales) have been paid by the Receiver

using MGG's cash collateral that was generated by the Receiver's sales of the Collateral.[7]  There

is no prospect, much less a guarantee, that if an Interim Trustee is appointed, MGG would be

_____

[6] To date, the Receiver has used cash collateral and discretionary protective advances from MGG to
pay aggregate costs for the first eight (8) months of the receivership totaling approximately
$1,300,000.00, or $160,000.00 per month. *See* September 25 Joella Declaration at ¶20.  In light of
these significant amounts, it is shocking that the Petitioning Creditors moved for the appointment of
an Interim Trustee on what was originally requested as two (2) business days' notice, and failed to
even address how an Interim Trustee would function, or what role he/she would assume considering
that the Receiver has been in control, and has made substantial progress, over the past eight (8)
months.

[7] As stated in Footnote 6 above, the costs of the receivership paid, either directly or indirectly by
MGG to date, have totaled approximately $1,300,000.00.

willing to continue to fund the costs and expenses of any modified arrangement, particularly if the costs of pursuing an alternative liquidation process are duplicative of costs that have already been incurred, or are more costly, or could reasonably be expected to impair what is anticipated to be accomplished by allowing the Receiver to remain in place and complete her assignment.[8] At this juncture, MGG does not consent to the use of its cash collateral to fund any costs and expenses of an Interim Trustee.  Given the fact that there are no unencumbered assets of Zayat Stables, it is not clear how the appointment of an Interim Trustee will lead to an orderly liquidation of the Collateral that will be in the best interests of creditors of the Alleged Debtor; and the Petitioning Creditors make no attempt in their Interim Trustee Motion to address this threshold issue.  Moreover, the Petitioning Creditors filed the Involuntary Chapter 7 Case and are seeking an Interim Trustee to run the business of Zayat Stables, yet they have made no attempt to address the requirements set forth in Section 721 of the Bankruptcy Code[9], further demonstrating the poorly conceived nature of their actions.  Specifically, the Petitioning Creditors have offered no evidence as to why the appointment of an Interim Trustee would be in the best interest of the estate (particularly in light of the significant efforts already expended by the Receiver) or why such appointment would be consistent with the orderly liquidation of the estate (insofar as that task has, for months, been well underway by the Receiver, as discussed herein in detail).

---

[8] In the event an Interim Trustee is appointed and the Receiver is not excused from compliance with Section 543(b) of the Bankruptcy Code, it is likely that MGG would immediately seek relief from the automatic stay to permit the liquidation of the remaining Collateral under applicable State law, putting all parties in no better position than where they are today.  Further, given that there is no equity in the Collateral and it is not necessary to an effective reorganization, it is likely such relief would be granted, or that the Interim Trustee would have no alternative other than to abandon the Collateral to MGG.

[9] Bankruptcy Code Section 721 provides: "The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate."

7.     Under these circumstances, there is ample cause for this Court to deny the Petitioning Creditors' request for the appointment of an Interim Trustee.  If, however, the Court determines it necessary and appropriate to appoint an Interim Trustee and assuming an order for relief is ultimately entered in the Involuntary Chapter 7 Case, MGG respectfully requests (i) that such appointment not disrupt the status quo of the receivership, (ii) that the Receiver remain in place and continue to be in control of the maintenance of the Collateral and the liquidation thereof, and that an Interim Trustee be granted no more than "observation rights" with respect to those matters within the primary control of the Receiver, (iii) that an Interim Trustee focus on bankruptcy-related matters only, that are not within the purview of a state court receiver (*e.g.*, investigating and prosecuting potential avoidance actions), (iv) that the scope of an Interim Trustee's duties and obligations not be duplicative of or interfere with or suspend any of the actions taken or to be taken by the Receiver, and (v) that until the liquidation of the Collateral is complete, an Interim Trustee not be granted any authority to preempt, control, take charge over or overrule the actions within the  purview and authority of the Receiver.[10]

8.     MGG respectfully requests that this Court excuse the Receiver's compliance with the turnover provisions of Bankruptcy Code Section 543(b) and allow the Receiver to remain in possession of the Collateral and its proceeds and to complete the liquidation of the remaining Collateral.

9.     Additionally, in the event that this Court determines it is appropriate to leave the Receiver in place, MGG respectfully submits that this Court enter, *nunc pro tunc* to the filing of

---

[10] Unless and until an order for relief is entered in the Involuntary Chapter 7 Case, MGG recognizes that the role of an Interim Trustee would be limited.  Nevertheless, during that period, MGG has no objection to the Court requiring that the Receiver report to an Interim Trustee (on an observer basis only) in connection with her progress with respect to the liquidation of the Collateral and the continuing payment of ordinary and necessary operating expenses.

the Involuntary Chapter 7 Case, an interim order, pursuant to Bankruptcy Code Sections 105 and 364, allowing the Receiver to continue to use MGG's cash collateral and permitting MGG to continue to make discretionary protective advances, in each case consistent with and to be governed by MGG's rights as a secured creditor under the Loan Documents.

10.    Finally, MGG requests that, as and to the extent necessary to implement the relief requested in this Motion, the Court order relief from the automatic stay imposed by Bankruptcy Code Section 362(a).

<u>**STATEMENT OF MATERIAL FACTS**</u>

**A.    Financing Agreement Between MGG and Alleged Debtor Zayat Stables**

11.    Zayat Stables is wholly owned by Zayat, an individual who is now a debtor in a separate Chapter 7 bankruptcy case pending before this Court. In 2016, several years after emerging from a prior bankruptcy case and on the heels of American Pharoah's Triple Crown performance, Zayat Stables approached MGG to obtain financing to invest in additional thoroughbred horses.  At the time MGG and Zayat Stables entered into the Loan Documents, Zayat Stables represented that it owned over seventy (70) thoroughbred horses with significant value, which were to serve as part of the  Collateral to secure any loans to be extended by MGG to Zayat Stables.

12.    Commencing in or around July 2016, certain affiliates and related funds of MGG agreed to make a series of loans of up to as much as $35 million (of which $10 million was earmarked as a discretionary delayed draw term loan) to Zayat Stables. Those loans are governed by several agreements, including the Financing Agreement (Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit C) and the Pledge and Security Agreement

(Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit F) (collectively, the "**Loan Documents**").

13.    Pursuant to the Loan Documents, Zayat Stables pledged all of its assets and property as "Collateral" for the loans. Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit C (Financing Agreement at § 5.0l(d)(i)); Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit F (Pledge and Security Agreement at § 2). "Collateral" is defined in the Loan Documents as all assets of Zayat Stables, including, but not limited to, "Equine Collateral," which in turn includes "[a]ll horses, stallions, mares, weanlings, foals, thoroughbred bloodstock and/or stallion shares, breeding rights, lifetime breeding rights ...." Complaint, Exhibit C (Financing Agreement at § 1.01). The Loan Documents protect MGG's interests in the Collateral in several critical ways, including as particularly relevant here, prohibiting Zayat Stables from selling any Collateral (including, without limitation, Equine Collateral) unless any such sale constitutes a Permitted Disposition (as defined in the Financing Agreement). Among the conditions required for a sale to constitute a Permitted Disposition, Zayat Stables was required to apply an agreed-upon portion of the proceeds of the sale (which for certain types of sales was 100% of the proceeds) to prepay the loans. Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit C (Financing Agreement at §§ 2.05(c)(ii), 7.02(c)).  Additionally, Zayat Stables was required to notify MGG in advance of any sale of Equine Collateral. *(Id.; See* Definition of Permitted Disposition, § 2.05(c)(ii), 7.02(c)).

14.    In the case of an ongoing "Event of Default" under the Loan Documents, the Loan Documents further protected MGG by expressly providing that Zayat Stables irrevocably and unconditionally consented to the appointment of a receiver "without a hearing or prior notice," agreed "not to oppose or otherwise interfere" with any effort to get a receiver appointed,

and waived "any right to appeal the entry of an order authorizing the appointment" of a receiver.
Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit F (Pledge and Security
Agreement at § 9(h)).   Moreover, Zayat Stables expressly agreed that the receiver could ***"take
any action with respect to the Collateral to the maximum extent permitted by law"*** and would
have ***"all of the same powers that would otherwise be available to [Zayat Stables] ...."***
Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit F (Pledge and Security
Agreement at § 9(h)(i) (emphasis added)).

**B.     Zayat Stables Defaults Under the Loan Documents and Hides Sales and Proceeds of Equine Collateral**

15.     For the first few years after the closing of the loan transactions, Zayat Stables
made required payments under the Loan Documents – albeit it now appears that such payments
were made, in part, with proceeds of improper and undisclosed sales of Equine Collateral, as
detailed below. However, commencing with the payment due September 30, 2019, Zayat Stables
failed to make the required payments to MGG due under the Loan Documents.

16.     In connection with discussions concerning a possible consensual liquidation of
Zayat Stables in December 2019, Zayat first informed MGG that Zayat Stables had, since 2017,
privately sold some of its most valuable Equine Collateral without providing notice to MGG or
paying MGG the release prices required under the Loan Documents. Complaint (Exhibit 1 to the
September 25 Joella Declaration) at ¶¶45-47.   By way of example but not exclusion, on
November 15, 2017, Zayat Stables improperly, and without disclosing it for several years, sold
AMERICAN CLEOPATRA for $1.3 million, 40% of which ($520,000.00) Zayat Stables was
obligated to use to pay down principal on MGG's loans.   Rather than disclosing this sale and
making any of the $520,000.00 in mandatory principal payments due to MGG on account of
such sale, Zayat Stables dodged the mandatory prepayment obligation by concealing the

transaction from MGG. Complaint (Exhibit 1 to the September 25 Joella Declaration) at ¶68. Importantly, given the surreptitious manner in which Zayat Stables sold the Equine Collateral (including breeding rights relating to American Pharaoh), there was no reasonable means by which MGG could determine such Collateral had been sold. *See* email from Zayat to MGG dated January 12, 2020, Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit Q. Indeed, private sales are not necessarily publicly reported in the trade press and the Equine Collateral was boarded at different stables around the country (generally in close proximity to the chosen trainer) and thus MGG could not simply visit a single stable to determine the ownership status of the horses.

17.    On December 4, 2019, MGG gave written notice to Zayat Stables of the Events of Default arising from various then existing Payment Defaults. *See* September 25 Joella Declaration at ¶8 and Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit O. Thereafter, Zayat Stables failed to make additional required payments to MGG, including the payment of principal due on December 31, 2019, the payments of interest due on January 1, 2020 and thereafter, and an additional quarterly Loan Servicing Fee payment of $10,000 due on January 1, 2020. Each of these missed payments constituted an additional Event of Default under the Loan Documents, and each also gave MGG the right to accelerate the Loans and demand the immediate repayment of all outstanding amounts.

18.    Zayat Stables did not make any payments to satisfy the amounts due and outstanding and none of the Events of Default were waived. As a result, on February 10, 2020, MGG exercised its right to accelerate the Loans and demanded that Zayat Stables immediately pay all amounts due under the Loan Documents. *See* September 25 Joella Declaration at Exhibit

12

2 (Notice of Acceleration). Notwithstanding the acceleration of the Loans, Zayat Stables made no payments in satisfaction of the amounts due and owing to MGG under the Loan Documents.

**C.    MGG's Kentucky Suit Against Zayat and Zayat Stables; Appointment of Receiver**

19.    On or about January 21, 2020, MGG filed suit in the Kentucky Court  against Zayat Stables and Zayat seeking fraud and contract damages as well as the appointment of a receiver (which was, under the Loan Documents, explicitly permitted upon the occurrence of an Event of Default).   The filing came shortly after Zayat admitted to MGG that he and Zayat Stables had sold Collateral securing MGG's loans worth several million dollars in direct contravention of the clear and unambiguous terms of the Loan Documents, including but not limited to valuable breeding rights to the 2015 Triple Crown winner, American Pharaoh.  *See* email from Zayat to MGG dated January 12, 2020, Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit Q.

20.    After an emergency hearing on MGG's request for the appointment of a receiver, the Kentucky Court entered its "Order Appointing Receiver" (the "**Receiver Order**") on January 22, 2020.  See September 25 Joella Declaration at Exhibit 3.

21.    The Kentucky Court approved the retention of the Receiver, Elizabeth Woodward.  Ms. Woodward is a CPA with over 25 years of experience in both the equine industry and as a receiver.  Mrs. Woodward, employed by the accounting firm Dean Dorton Allen Ford (one of the preeminent equine accounting firms in the country), is a Certified Fraud Examiner and leads her firm's forensic group.[11]

---

[11] MGG is informed that the Receiver intends to file papers in opposition to the Interim Trustee Motion, which opposition will further detail the  qualifications of the Receiver and her professionals, as well as describe the results of her efforts to date in managing Zayat Stables and liquidating the Collateral.

22.    To aid in the performance of her duties as Receiver, Ms. Woodward retained legal counsel and worked with an established and respected equine consultant, Mr. Gatewood Bell of Cromwell Bloodstock,[12] both of whom have extensive experience in the highly specialized equine industry. To date, the Receiver has successfully liquidated the majority of the Equine Collateral. Of the forty-five (45) horses that existed when the Receiver took over operations, only fifteen (15) remain to be liquidated.

23.    On January 27, 2020, Zayat Stables moved in the Kentucky Court to dissolve the January 22, 2020 Receivership Order (the "**Receiver Dissolution Motion**") on the purported grounds that MGG's motion seeking the appointment of a receiver was improperly noticed and heard, and that the Kentucky Court otherwise erred in granting the requested relief.  In so arguing, Zayat Stables ignored the fact that it had contractually agreed, in Section 9(h) of the Pledge and Security Agreement (Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit F), that upon the occurrence of an Event of Default, MGG could immediately appoint a receiver without any notice to or input from Zayat Stables. Additionally, pursuant to Section 9(h)(i) of the Pledge and Security Agreement (Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit F, § 9(h)(i)), Zayat Stables had agreed not to take any action in opposition to the appointment of a receiver.

24.    In the alternative, Zayat Stables requested in the Receiver Dissolution Motion that the Receivership Order be re-written to permit the Receiver to *only* manage and liquidate the Equine Collateral.  More specifically, Zayat Stables contended that the Receiver had wrongly been permitted to assume control of the day-to-day operations of Zayat Stables rather than being

---

[12] Cromwell Bloodstock was initially retained by MGG.  Upon the appointment of the Receiver MGG released Cromwell Bloodstock from that engagement and Cromwell was subsequently engaged by the Receiver.

limited to liquidating the Equine Collateral. First and foremost, in so arguing, Zayat Stables ignored that MGG's lien covers all or substantially all of Zayat Stables' assets.

25.    Importantly, Zayat Stables has repeatedly acknowledged that it does not have the funds necessary to operate the business on even the most basic of levels (*e.g.*, buying food and other necessities and paying for veterinary services). Complaint (Exhibit 1 to the September 25 Joella Declaration) at Exhibit Q. Accordingly, in connection with the receivership, MGG has been required to make discretionary protective advances under the Loan Documents and  to permit the Receiver to use MGG's cash collateral to ensure the continued health and safety of the horses pending their liquidation by the Receiver.[13]

26.    After the completion of briefing and oral argument, on February 14, 2020,  the Kentucky Court entered an order denying the relief requested in the Receiver Dissolution Motion and required that Zayat Stables immediately turnover, subject to an appropriate protective order, its books and records and a copy of the computer server maintained by Zayat Stables. *See* September 25 Joella Declaration at Exhibit .

27.    On February 18, 2020, the Receiver filed a motion in the Kentucky Court requesting that the Court modify the Receiver Order to more explicitly detail the rights of the Receiver with respect to the Equine Collateral. After the completion of briefing and oral argument, the Kentucky Court entered an order granting the Receiver the relief requested and overruled Zayat Stables' objections thereto. *See* September 25 Joella Declaration at Exhibit 5.

---

[13] As previously noted, if an Interim Trustee were to be appointed and such appointment led to a disruption of the receivership, or imposed increased costs thereon or adversely impacted or impaired the prospects for an orderly completion of the receivership, MGG is not prepared to allow any Interim Trustee to use MGG's cash collateral, nor is it committed to making further discretionary protective advances under such circumstances.

28.     On June 25, 2020, the Kentucky Court entered an Order granting MGG's summary judgment motion against the Alleged Debtor and in favor of MGG in the amount of $24,534,166.13 (the "**MSJ Order**").  A copy of the MSJ Order is attached to the September 25 Joella Declaration  as Exhibit 6.  The MSJ Order precludes MGG from taking any actions to enforce the judgment unless and until the MSJ Order becomes a final, non-appealable order. *Id*.

**D.     Voluntary and Involuntary Chapter 7 Petitions**

29.     After failing to obtain any relief from the Kentucky Court with respect to the receivership, Zayat filed a chapter voluntary chapter 7 petition in this Court on September 8, 2020, which case has been assigned case number 20-20524-VFP (the "**Zayat Chapter 7 Case**").

30.     Less than one week later, on or about September 14, 2020, an involuntary chapter 7 petition was filed by three alleged creditors of Zayat Stables in this Court, which case has been assigned case number 20-20387-VFP (the "**Zayat Stables Involuntary Chapter 7 Case**").[14]

**REQUESTED RELIEF**

31.     By this Motion, MGG respectfully requests that this Court enter an order substantially in the form of the Proposed Order: (a) excusing the Receiver from compliance with the requirements of Bankruptcy Code Section 543(b); (b) during the "Gap Period," allowing the Receiver to (i) continue to use MGG's cash collateral and (ii) permit MGG to continue to make, and the Receiver to accept, discretionary protective advances from MGG (in each case consistent with and to be governed by MGG's rights as a secured creditor under the Loan Documents), as may be necessary to fund the operations of the receivership and to preserve the Collateral until the Receiver completes the liquidation thereof; (c) granting limited relief from the automatic stay

---

[14] Documents produced by the Petitioning Creditors establish that they were preparing to file the Zayat Stables Involuntary Chapter 7 Case well before Zayat filed his Chapter 7 petition. *See* September 25 Joella Declaration at Exhibit 10.

provisions of the Bankruptcy Code as and to the extent necessary to implement the relief sought

hereby; and (d) denying, or in the alternative, modifying the relief requested by the Petitioning

Creditors in the Interim Trustee Motion.

## BASIS FOR RELIEF

### A.  Relief Under Bankruptcy Code Section 543(b) is Appropriate Under the Circumstances

32.    Section 543(b) of the Bankruptcy Code requires, subject to the discretion of the

court, that a "custodian" deliver to the trustee or debtor in possession all property of the debtor,

or proceeds, products, offspring, rents, or profits of such property, which is in the custodian's

possession, and to provide an accounting of the same upon learning of the debtor has filed for

bankruptcy protection. 11 U.S.C. § 543(b).  A receiver appointed in a state court proceeding is a

"custodian" subject to the requirements of Section 543(b). *See* 11 U.S.C. § 101(11).

33.    The requirements under Bankruptcy Code Section 543(b) are not absolute.

Section 543(d) of the Bankruptcy Code explicitly provides that a court *may* excuse compliance

with section 543(b) if the interests of creditors would be better served by permitting the

custodian (in this case, the Receiver) to remain in possession, custody or control of such

property.  *See* 11 U.S.C. § 543(d); *see also In re Falconridge, LLC*, 2007 WL 3332769, at *7

(Bankr. N.D. Ill. Nov. 8, 2007). Moreover, evidence of the mismanagement of the debtor's

property may negate the statutory obligation of a custodian to turn over assets to the debtor. *See

In re Foundry of Barrington P'ship*, 129 B.R. 550, 558 (Bankr. N. D. Ill. 1991); *see also

Falconridge, LLC*, 2007 WL 3332769, at *6.

34.    There is no definitive test to determine whether and when a custodian should be

excused from its obligations under Bankruptcy Code Section 543(b). "Of necessity, this must be

on a case by case analysis and no generic rule can be proclaimed." *Falconridge*, 2007 WL

3332769, at *7. Courts have weighed a number of factors based on the specific facts of each case when analyzing this issue. *Id.*

35.    The factors to be considered whether to excuse a custodian from compliance with its obligations under Section 543(b) include:

> (1) The likelihood of reorganization, and whether funds held by the receiver are required for reorganization;
>
> (2) Whether the debtor mismanaged the property;
>
> (3) Whether turnover would injure the creditors;
>
> (4) Whether the debtor would use the property for the creditors' benefit;
>
> (5) Whether there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and
>
> (6) The fact that the automatic stay has deactivated the state court receiver action.

*Dill v. Dime Sav. Bank*, 163 B.R. 221, 226 (E.D.N.Y.1994); *In re Lizeric Realty*, 188 B.R. 499, 506-507 (Bankr. S.D.N.Y. 1995); *In re Northgate Terrace Apartments, Ltd.,* 117 B.R. 328, 332 (Bankr. S.D. Ohio); *In re Poplar Springs Apartments*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989); *In re WPAS, Inc.*, 6 B.R. 40, 43-44 (Bankr. M. D. Fla.1980). The interests of the debtor are not to be considered in the court's decision. *Falconridge*, at *7, *citing Dill*, 163 B.R. at 225; *Foundry of Barrington P'ship v. Barrett (In re Foundry of Barrington P'ship)*, 129 B.R. 550, 557 (Bankr.N.D.Ill.1991). Whether the Court decides to apply § 543(d)(1) is based on the exercise of its discretion. *See In re R & G Properties, Inc.*, 2008 WL 4966774, at *4 (Bankr.D.Vt.2008), *citing Dill*, 163 B.R. at 225; *Northgate Terrace Apts.*, 117 B.R. at 332.

36.    Here, MGG respectfully submits that the Court should exercise its discretion under Section 543(d) and excuse the Receiver from surrendering the Collateral and the proceeds thereof in the Receiver's possession to the Alleged Debtor or an Interim Trustee (if one is appointed by this Court).  Likewise, the Court should deny any request of the Alleged Debtor or any Interim Trustee  to use MGG's cash collateral, other than as requested by the Receiver in the normal course of her duties under the Receiver Order. Each of the factors traditionally considered by courts in weighing whether to waive compliance with Bankruptcy Code Section 543(b) plainly establishes that the interests of the Alleged Debtor's creditors would be better served by permitting the Receiver to remain in possession and control of the remaining Collateral and all proceeds thereof pending further order of the Court.

37.    First, there is little likelihood (a) that the Alleged Debtor will be able to reorganize even if the Receiver were to tender all of the property in her possession to the Alleged Debtor or an Interim Trustee; or (b) that there will even be monies available to fund a reorganization.  As repeatedly acknowledged by the Alleged Debtor, sufficient unencumbered funds do not remain in the possession or control of the Alleged Debtor to operate its business.  Additionally, the involuntary case was filed as a Chapter 7 case, which contemplates a liquidation of the Alleged Debtor's estate.  Accordingly, the first two factors courts consider in determining whether it is appropriate to excuse a Receiver's compliance with Bankruptcy Code Section 543(b) favor the conclusion that the Receiver should remain in possession of the Collateral and the proceeds thereof.

38.    Second, as set forth above, there is extensive evidence reflecting Zayat's mismanagement of the Alleged Debtor to and for his own financial benefit.  As a result, it would not be reasonable for Zayat to assume any operational or management control over Zayat

Stables.[15]   In the instant case, the Petitioning Creditors have sought the appointment of an

Interim Trustee to assume operational control over the Alleged Debtor's business and the

Collateral that is presently in the possession of the Receiver. An Interim Trustee, however, will

have no knowledge of the Alleged Debtor's operations, assets or liabilities. Accordingly, any

Interim Trustee that may be appointed will face a steep learning curve that will be expensive and

time consuming.  In contrast, the Receiver has been in place for over eight (8) months and has

successfully assumed operational control and liquidated the majority of the Collateral.  All of the

proceeds are being held in a segregated account and have only been used by the Receiver to fund

post-receivership ordinary course operations consistent with approvals obtained from MGG

regarding the use of its cash collateral.  The Receiver has not and will not make any distributions

to MGG until it is definitively determined that MGG has the superior right, title and interest

therein.   As set forth in the Receiver's most recent monthly report for the month ending August

31, 2020 (a copy of which is attached as part of Exhibit 7 to the September 25 Joella

Declaration), the Receiver has acted diligently and competently to manage Zayat Stables'

business. One would be hard-pressed to imagine circumstances that would more amply

demonstrate that the interests of Zayat Stables' creditors would be best served by leaving the

Receiver in operational control of Zayat Stables' business and in possession of the Collateral to

complete the liquidation thereof.

        39.      Third, the last two factors noted above also favor allowing the Receiver to remain

in possession because: (a) allowing the Receiver to remain in possession of the Collateral and

their proceeds will not impact the Alleged Debtor's avoidance causes of action; and (b) the

impact of the automatic stay is not relevant here.  With respect to any avoidance actions, it

---

[15] Given the pendency of Zayat's personal bankruptcy, control here would likely be vested in the
Chapter 7 trustee appointed in that case, Mr. Biase, which makes even less sense.

appears that the Alleged Debtor's most significant claims may, in fact, be against Zayat, members of his immediate family, or other insiders or related parties. Thus, while it may later prove appropriate for a trustee to investigate the existence of potential avoidance actions against Zayat and other related third parties, turning the Collateral and their proceeds over at this point to an Interim Trustee with no background knowledge or experience with respect to Zayat Stables (or the thoroughbred industry generally) makes no practical sense.

**B.      The Receiver, as Custodian for the Alleged Debtor Should, During the "Gap Period" be Allowed, with MGG's Prior Consent, to Continue to Use MGG's Cash Collateral and to Accept Discretionary Protective Advances from MGG, Each as May be Necessary to Fund the Operations of the Receivership and to Preserve the Collateral Pursuant to Bankruptcy Code Sections 105 and 364**

40.      As previously stated, the Alleged Debtor lacks any unencumbered funds from the liquidation of Zayat Stables' assets, and absent the use of funds from the liquidation of the Collateral, the Receiver will not have the funds to support the necessary and ordinary course operating expenses of the Receiver.  As a result, MGG has, prior to the filing of the Zayat Stables Involuntary Chapter 7 Case, worked with the Receiver and negotiated a consensual arrangement to allow the Receiver to use MGG's cash collateral and to accept discretionary protective advances from MGG, each in accordance with MGG's rights as a secured creditor under the Loan Documents, to cover the monthly costs of the receivership.   In this way, MGG has, and assuming the Receiver stays in place, will continue to preserve the value of the Collateral pending the liquidation thereof by the Receiver.  MGG requests that the Court authorize and approve the continuation of the existing arrangement between the Receiver (as custodian for the Alleged Debtor) and MGG, whereby the Receiver is allowed to use, with MGG's prior consent, MGG's cash collateral subject to MGG's rights under the Loan

Documents, and MGG is allowed to continue to make and the Receiver is allowed to accept discretionary protective advances subject to MGG's rights under the Loan Documents.

41.    After the filing of an involuntary Chapter 7 petition and given what some courts and commentators have suggested are uncertainties in the Bankruptcy Code with respect to the ability of an involuntary chapter 7 debtor to continue to obtain secured financing in the Gap Period, MGG requests that on an interim basis, it be authorized to continue to make discretionary protective advances to cover certain of the Receiver's expenses and to allow the Receiver to continue to use its cash collateral as necessary to fund the receivership during the Gap Period and, on an expedited basis, seeks entry of an order of this Court, *inter alia*: (A) allowing the Receiver (as custodian for the Alleged Debtor) to continue to: (i) use MGG's cash collateral under and subject to the liens granted to MGG under the Loan Documents and (ii) permit MGG to make and the Receiver to accept discretionary protective advances from MGG in accordance with the Loan Documents to partially fund other expenses of the receivership, (B) confirming that the Receiver's use of MGG's cash collateral and MGG's making of discretionary protective advances to cover other expenses of the receivership is being made in accordance with MGG's secured rights under the Loan Documents and the security interests granted in favor of MGG thereby; and (C) finding and determining that MGG shall not be found to have waived any existing and continuing defaults or other rights under the Loan Documents as a result of its allowing the Receiver to use cash collateral or by the making of discretionary protective advances under the Loan Documents during the "Gap Period."

**C.    Necessity of Obtaining an Order Permitting Incurrence of Secured Credit During the "Gap Period"**

42.    During the Gap Period, the Bankruptcy Code grants an involuntary debtor certain protections that are designed to minimize the potential impact of an involuntary filing on the

operations and financial affairs of an involuntary debtor pending a court's adjudication of the propriety of the filing of the involuntary petition. In such regard, Bankruptcy Code Section 303(f) provides:

> Notwithstanding section 363 … except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

43.     Thus, under the plain language of Bankruptcy Code Section 303(f), an involuntary debtor is free, absent an order of the court to the contrary, to continue to operate its business, conduct its financial affairs and to continue to use, acquire or dispose of its property without the restraints otherwise imposed under Bankruptcy Code Section 363.

44.     In the instant case, absent the consensual use of MGG's cash collateral and the receipt of discretionary protective advances from MGG, the Receiver (assuming that she remains in place) does not have funds sufficient to maintain the receivership and complete the orderly liquidation of the Collateral.   To date, it has been necessary for the Receiver to rely on discretionary protective advances from MGG and to utilize MGG's cash collateral with MGG's express consent in order to fund the receivership.   Accordingly,   the only and best option available to the Receiver to complete the liquidation of the Collateral is to continue to use MGG's cash collateral and to accept discretionary protective advances subject to MGG's rights under the Loan Documents for the limited purpose of funding the receivership, including, without limitation, continuing MGG's first priority security interest in all of the Collateral to

secure all of the Obligations to MGG under the Loan Documents, including those obligations arising from the use of MGG's cash collateral and from discretionary protective advances.

45.     Unfortunately, Bankruptcy Code Section 303(f) does not clearly permit an involuntary debtor to continue to borrow on a secured basis and in the ordinary course of business during the Gap Period.  Indeed, both courts and commentators have questioned whether the same is permissible during the Gap Period absent an order pursuant to Bankruptcy Code Section 364. *See, e.g*., Joseph Mullin, Comment, Bridging the Gap: Defining the Debtor's Status During the Involuntary Gap Period, 61 U.Chi.L.Rev. 1091 (1991) (and cases cited therein); *see, also, e.g.,* 2 Collier on Bankruptcy ¶ 303.26 (Richard Levin & Henry J. Sommer eds., 16th ed. 2016).

46.     Potential threats of continuing to provide secured credit, even in the ordinary course of business, absent an order of a court include the filing of an avoidance action by a subsequently appointed trustee under Bankruptcy Code Section 549.  *See, e.g., Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51 (1st Cir. 2004).   In such a case, although the secured creditor may ultimately prevail on one of several theories, the uncertainty and costs associated with defending any such action plainly speak against proceeding without court authorization.

47.     As a result of the foregoing, MGG is requesting that this Court enter an order that memorializes its ability to allow the Receiver to continue to use its cash collateral subject to MGG's secured rights under the Loan Documents in and to such cash proceeds of its Collateral and to further authorize MGG to continue to make discretionary protective advances to defray other portions of the Receiver's costs and expenses, subject to MGG's rights under the Loan Documents.

48.     After the September 14, 2020 filing of the involuntary Chapter 7 petition, MGG did continue to allow the Receiver to use some of its cash collateral.  After the Scheduling Conference with the Court on September 18, 2020, the Receiver has continued to use MGG's cash collateral consistent with the discussion during the Scheduling Conference.  Accordingly, MGG hereby requests that any order granting the relief requested herein be *nunc pro tunc* to September 14, 2020.

**D.      Pursuant to Bankruptcy Code Sections 105(a) and 364, this Court Should Enter an Order Permitting the Receiver (as Custodian for the Alleged Debtor), During the "Gap Period" to Continue to Use MGG's Cash Collateral and to Accept Discretionary Protective Advances from MGG, Each in Accordance with MGG's Rights as Secured Creditor Under the Loan Documents, as May be Necessary to Fund the Operations of the Receivership and to Preserve the Collateral**

49.     Bankruptcy Code Section 105(a) provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

50.     Section 364 of the Bankruptcy Code governs a debtor or trustee's ability to obtain postpetition credit and provides, in pertinent part, as follows:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d) (1) The Court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

    (A)    the trustee is unable to obtain such credit otherwise; and

    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

51.    Generally, courts apply a three-part test to determine whether a trustee or debtor may obtain credit under Bankruptcy Code Section 364(c).  Under such test, a trustee or debtor may incur postpetition financing if it demonstrates that (a) it cannot obtain credit unencumbered or without superpriority status, (b) the postpetition financing is necessary to preserve the assets of the estate, and (c) the terms of the postpetition financing are fair, reasonable and adequate given the circumstances of the debtor and the proposed lenders. *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); *see also In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).  Applying these standards, to the extent that the Court views MGG's request for the Receiver to be authorized to continue using MGG's cash collateral and to continue to accept protective advance from MGG to fund certain of the expenses of the receivership as "obtaining credit," such funding mechanisms would fall within the scope of Section 364(c).  In addition, Section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured debtor or "priming" liens if (a) the debtor is unable to obtain financing from another source and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. 11 U.S.C. § 364(d)(1); *see also Aqua Assocs.*, 123 B.R. at 196.

52.    Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990).  A trustee or debtor is generally permitted to exercise its basic business judgment consistent with its fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under Section 364 of the Bankruptcy Code. *Id.* at 38.

        **(i)**       **Zayat Stables and the Receiver, as Custodian of the Assets of Zayat Stables, are Unable to Obtain Unsecured, Administrative Priority or Junior Secured Credit**

53.    A trustee or debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.    *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *see also Anchor Sav. Bank*, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) of the Bankruptcy Code by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37-40 (debtor in possession must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some

financial stress and has little or no unencumbered property"), *aff'd sub nom., Anchor Sav. Bank*, 99 B.R. at 117.  This is true especially when time is of the essence. *In re Reading Tube Indus*., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

54.    As discussed herein, all of the Alleged Debtor's assets are subject to prepetition liens in favor of MGG.  Because of the Alleged Debtor's prepetition secured debt and the fact that Zayat Stables, under the control of the Receiver, is liquidating the Collateral and winding down operations, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be unsecured or secured solely by liens junior to the prepetition liens, is not a viable option.  Moreover, the Receiver requires immediate access to the continued use of MGG's cash collateral and to discretionary protective advances from MGG in order to complete a liquidation during the Gap Period and beyond. In short, given the Alleged Debtor's significant financial issues, the fact that its operations are in the midst of being liquidated by the Receiver and the pendency of the involuntary Chapter 7 case, there are realistically no other financing options available.

**(ii) The Use of MGG's Cash Collateral and Discretionary Protective Advances By the Receiver are Necessary to Preserve the Remaining Collateral Pending Liquidation**

55.    Without access to the continued use of MGG's cash collateral and discretionary protective advances during the "Gap Period," the Receiver will be forced to immediately liquidate the remaining Collateral on a "fire sale" basis.  Instead, with the continued use of MGG's cash collateral and discretionary protective advances, the Receiver will be able to continue operations for the few additional months necessary to orderly liquidate the remaining Collateral and obtain the best prices and maximum values available.

56.     In addition, while MGG is not seeking relief from the automatic stay at this time except to the limited extent necessary in connection with its request for relief under Bankruptcy Code Section 543(b) as set forth in the Proposed Order, MGG respectfully submits that there would be ample grounds to grant MGG that relief, and thus, the existence of the automatic stay does not counsel in favor of enforcing the turnover provisions of Section 543(b) of the Bankruptcy Code.  MGG has already obtained a judgment against Zayat Stables in the Kentucky Litigation.  Given the state of the Alleged Debtor's business and Zayat's surreptitious sale of valuable Collateral pledged to MGG to secure its obligations to MGG under the Loan Documents, the Alleged Debtor could not provide MGG with adequate protection of its interest in the Collateral.  On the other hand, the Receiver has effectively managed the Collateral for over eight (8) months.  Accordingly, MGG respectfully submits that the Receiver should remain in possession and continue to liquidate the remaining Collateral, after which time this Court should determine how best to wind up whatever may be left of the Chapter 7 case.

**E.     This Court Should Grant Relief, As and To the Extent Necessary, From the Automatic Stay Provisions of Bankruptcy Code Section 363 in Order to Implement the Relief Granted in this Motion**

57.     Although it is unclear that relief from the automatic stay provisions of the Bankruptcy Code would be necessary to ensure that MGG can fully implement the relief to be granted in any Order entered by this Court with respect to the relief requested in this Motion, out of an abundance of caution, MGG is also asking that this Court order that any applicable provisions of Bankruptcy Code Section 363 are waived as and to the extent necessary to implement the requested relief.

## **NOTICE**

58.     Notice of the Motion will be given to counsel for Zayat in the Zayat Chapter 7

Case, the Chapter 7 trustee appointed in the Zayat Chapter 7 Case, counsel for the Petitioning

Creditors in the Zayat Stables Involuntary Chapter 7 Case, and the Office of the United States

Trustee.

## **WAIVER OF STAY**

59.     MGG requests that the Order be effective immediately by providing that the 14-

day stay under Bankruptcy Rules 4001 and 6004(h) is waived.

## **CONCLUSION**

WHEREFORE, for all the foregoing reasons, MGG respectfully requests the Court enter

the Proposed Order granting the Motion and such other relief as the Court deems just and

appropriate under the circumstances.

**OKIN HOLLANDER LLC**

By:   _/s/ Paul S. Hollander_
       Paul S. Hollander

*Co-Counsel for MGG Investment Group LP*

DATED: September 25, 2020